IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**RASHEEN GRIFFIN,**
    **Plaintiff**

    v.

**HARRISBURG PROPERTY SERVICES, INC.,**
    **Defendant**

Civil No. 1:CV-08-1655

(Judge Sylvia H. Rambo)

## M E M O R A N D U M

The instant case is a civil rights action brought by Plaintiff Rasheen Griffin ("Griffin") seeking redress against Defendant Harrisburg Property Services, Inc., ("HPS") for alleged unlawful racial harassment and discrimination in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981. Griffin, who is African-American, is a security officer employed by HPS. Griffin alleges that during the course of his employment he was subjected to a pattern of racial harassment by his colleagues and supervisors. Before the court is HPS' motion for summary judgment. (Doc. 19). The motion is fully briefed and ripe for disposition.

## I. Background

### A. Facts[1]

Griffin was employed by HPS as a security officer. During the time period relevant to this lawsuit, Griffin was supervised by Thomas Kimble ("Kimble"). Kimble is Caucasian. The racial harassment that Griffin complains of consists of two comments by Kimble, and a text message sent by Kimble to Griffin and others. Specifically, in June of 2007, Kimble made the following comment to Griffin: "You know why there are black people, because God left them in the oven too long." (Doc. 19-5, Rasheen Griffin Dep., 60; Doc. 27-1, Griffin Answer to Interrogs., at 5 of 10.) In August of 2007, Kimble told Griffin that "the reason why we have AIDS is because black men have sex with monkeys." (Doc. 27-1, Griffin Answer to Interrogs., at 5 of 10.) Finally, on October 16, 2007, Griffin received a text message on his mobile phone from Kimble that read: "Black babies were given wings by God. P.S. God does this mean I'm an angel. God laughed and said no nigga is means you are a bat." (*Id.*) Griffin received this text message while he was off duty, but it was sent by Kimble while Kimble was on duty. Kimble also sent the text message to other individuals. (Doc. 19-2, Thomas Kimble Dep., 21-22.) Before being promoted to supervisor, Kimble was a security officer who worked with

---

[1] In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir.1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Vadino*, 903 F.2d at 259. Here, the court will identify those facts that are subject to genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts. The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties. The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

Griffin. On occasion, Griffin and Kimble associated with each other outside of work.

The next time that Griffin was at work after having received the text message, he told several co-workers that he was offended by the text message. On October 19, 2007, Griffin filed a complaint about Kimble with Carol Rossi, Vice President of Human Relations for HPS. On Monday, October 22, 2007—six days after the text message—Rossi directed Anne Simmons, the Human Relations Manager, to conduct an investigation into the complaint by Griffin. (Doc. 19-4, Anne Simmons Dep., 11-12.) During the meeting with Simmons, Griffin requested a transfer to a position at another of HPS' properties so that he would be supervised by someone other than Kimble. This request was granted.

In addition to discussing receipt of the text message, Griffin voiced other complaints during his meeting with Simmons. Specifically, he complained of the two previous racially prejudiced statements made by Kimble; an incident where he believed that some of HPS' security officers racially profiled some teenagers while in Strawberry Square; and, his belief that HPS routinely assigned white security officers to patrol the Hilton Hotel and African-American security officers to patrol Strawberry Square. HPS undertook an investigation of all of these complaints. Specifically, in addition to interviewing Griffin, HPS interviewed Kimble and at least six other employees identified by Griffin as having knowledge of the substance of his complaints.[2]

---

[2] The following individuals were interviewed: Paul Burt, Al Pierce, Doug Brown, David Winters, Jeremy Gardner, and Kevin Martin. Plaintiff points to specifics of each of these interviews in support of his complaint of a racially hostile work environment. Specifically, he points to (1) an
(continued...)

Ultimately, HPS determined that Kimble sent an inappropriate joke to Griffin, and issued Kimble a final warning in his personnel file. Additionally, HPS conducted an in-house diversity training to educate its staff. The parties disagree about whether the remainder of Griffin's allegations were adequately addressed. According to Anne Simmons, HPS' investigation of the allegation of segregated scheduling was without merit. She testified at her deposition that she reviewed a list of where all of the security officers were assigned and it was either "fifty-fifty" or "60/40" in terms of the percentages of white versus African-American officers who were assigned to Strawberry Square versus the Hilton. (Doc. 19-4, Simmons Dep., 29:1.) Griffin points out that Simmons did not take any steps to determine whether the racial breakdown was more skewed on shifts for which Kimble was the supervisor. (*Id.*, 29:14-19.) Moreover, Griffin contends that to the extent his allegations of racial profiling and racist jokes were corroborated by other employees, he denies that they were found to be without a basis.

During the course of the investigation, Plaintiff went on a leave of absence which he had requested prior to his receipt of the text message.³ Plaintiff

---

²(...continued)
interview with Kevin Martin who admitted that he told African-American co-workers that he bartends at a private club that would not allow African-Americans to drink there, (Doc. 27-14, May 14, 2008 Notes of Interview); (2) an interview with David Winters where Winters told HPS that some employees were paged over their radios more frequently than other employees, (Doc. 27-16, October 24, 2007 Notes of Interview); (3) an interview with Al Pierce who admitted that HPS' employees made jokes about race, accents, religion, and that racial profiling does occur on the job, (Doc. 27-18, October 31, 2007 letter); and, an interview with David Winters where he confirmed that he overheard Kimble making racist jokes, (Doc. 27-20, May 1, 2008 Notes of Interview). It bears mentioning that none of these incidents is mentioned in Plaintiff's complaint.

³At times throughout the briefing of the instant motion, Plaintiff intimates that this leave of absence was caused by the text message; however, in response to Defendant's statement of material facts
(continued...)

4

returned to work in November of 2007, and met with HPS' human resources staff before coming back. At that meeting, the human resources staff informed Griffin of the steps they had taken to address his concerns, and asked him whether he had additional concerns at that time. He stated that he did not have additional concerns. (Doc. 19-4, Simmons Dep., 22-24.) However, in early 2008, Griffin reported to Carole Rossi that he was concerned because he believed that his supervisor was calling him too often over the radio. (Doc. 19-3, Rossi Dep., 29.) Defendant contends that this was investigated and found to be without merit. It is undisputed that after February 2008, Griffin did not go to HPS' human resource department with additional specific complaints about racial hostility or racial prejudice. (Doc. 19-5, Griffin Dep., 24-25.)

## B. Procedural History

In December 2007, Griffin filed a written charge of discrimination against HPS with the Philadelphia office of the Equal Employment Opportunity Commission ("EEOC") alleging racial harassment and discrimination. (*See* Doc. 19-5, Charge of Discrimination, at 122 of 176). In that Charge of Discrimination, Griffin complained only of the two racially derogatory comments made by Kimble in June of 2007, and the October 15, 2007 text message.[4] (*Id.*) The EEOC issued a

---

[3](...continued)
Plaintiff admits that the leave was requested before he received the text message, and that it was due to personal and family reasons not work related stresses. (*See* Doc. 20, ¶ 25; Doc. 27, ¶ 25.)

[4]Griffin filed a second EEOC complaint in May of 2008 alleging that he was being retaliated against by HPS through Ralph Shaw for having filed his initial complaint of harassment. (Doc. 27-21.) Griffin's retaliation claim is not a part of this lawsuit. His complaint clearly states that Griffin is suing only for harassment and discrimination; he does not mention retaliation in his complaint. (*See* Doc. 1.) In his brief in opposition to summary judgment, Griffin seeks leave to amend his complaint to include
(continued...)

Notice of Right to Sue letter on June 6, 2008, and Griffin initiated the instant case on September 5, 2008. (Doc. 1.)

After discovery, on July 6, 2009, Defendant HPS filed its motion for summary judgment, statement of material facts, supporting evidence and brief. (Docs. 19-21.) After receiving leave of court for additional time, Griffin filed his brief in opposition to Defendant's motion, supporting evidence, and answer to Defendant's statements of material fact on August 4, 2009. (Docs. 26-27.) On August 14, 2009, HPS filed its reply brief and answer to additional facts proposed by Plaintiff. (Docs. 28-29.) Defendant's motion is ripe for disposition by the court.

## II.     Legal Standard

"In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant. The employer must persuade [the court] that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions

---

⁴(...continued)
his retaliation claim. (*See* Doc. 26 at 10-11.) HPS opposes Griffin's request to amend. The court will not permit Griffin to amend his case at this point in the case. Griffin's retaliation claim involves different elements, different facts, and different parties than his harassment claim. *Compare* 42 U.S.C. § 2000e-2(a) *with* 42 U.S.C. § 2000e-3(a). It would require the reopening of discovery resulting in additional expense, delay, and undue burden on HPS. Griffin has been represented by counsel throughout the course of this case, and his claim of retaliation pre-dates the filing of this suit. Griffin could have brought a retaliation case at the same time as his discrimination claim but he did not do so. It is unclear why Griffin did not raise these claims earlier, but the court will not permit Griffin to amend his complaint after discovery has closed and dispositive motions are filed based on facts which were known to him at the time he commenced this case. As such, the court will limit its inquiry to only those facts supporting Griffin's harassment claim.

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. " 'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' " *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

**III.     Discussion**

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-(2)(a). The Supreme Court has specifically recognized that Title VII prohibits an employer from engaging in racial harassment that creates a hostile or offensive work environment. *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989); *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65 (1986). As the Supreme Court recognized in *Meritor*, "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." 477 U.S. at 65. Thus, individuals who are not directly discriminated against may assert a claim of hostile work environment; the statutory basis of which is the notion that "discriminatory ridicule or abuse can so infect a workplace that it alters the terms or conditions of the plaintiff's employment." *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2009), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co., v. White,* 548 U.S. 53 (2006).

In the instant case, Griffin has asserted a claim of a hostile work environment[5] at HPS due to two comments made by Kimble in June of 2007 and the October 2007 text message. To support such a claim, Griffin has an obligation, in opposing summary judgment, to come forward with evidence supporting a *prima facie* case. Specifically, he must demonstrate: (1) he suffered intentional harassment

---

[5] In addition to claims under Title VII, Plaintiff asserts a claim pursuant to 42 U.S.C. § 1981. The elements of a hostile work environment are the same under § 1981 as they are under Title VII. *Ocasio v. Lehigh Valley Family Health Ctr.*, 92 F. App'x 876, 879 (3d Cir. 2004). Thus, the court will address these claims together.

8

based on race; (2) the harassment was severe or pervasive;[6] (3) the harassment detrimentally affected him; (4) the harassment would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability. *See Jensen*, 435 F.3d at 449.

HPS contends that Griffin cannot overcome this *prima facie* showing because he cannot demonstrate that he suffered racial discrimination, and, even assuming that he did suffer racial discrimination, that it was not severe or pervasive enough to create an objectively hostile or abusive environment. Moreover, HPS argues that Griffin failed to proffer any evidence reflecting that the text message and the alleged comments interfered with his work performance or affected his psychological well-being. Finally, HPS alleges that it has upheld its legal obligation to perform a prompt and adequate investigation and to remedy the alleged harassment and discrimination. The court will address each of these in turn.

### A. **Intentional Harassment Based on Race**

In its brief in support of its motion for summary judgment, HPS argues that "[t]here is no evidence in the record to suggest that Plaintiff suffered a hostile work environment and/or unlawful harassment." (Doc. 21 at 8.) Despite this claim, the court finds that there is ample evidence in the record supporting Griffin's

---

[6]The Third Circuit has often stated that discriminatory harassment must be "severe and pervasive." *See e.g., Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). But the Supreme Court's standard is "severe or pervasive." *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004). As the Third Circuit recognized in *Jensen*, "the difference is meaningful, and the Supreme Court's word controls." 435 F.3d at 449 n. 3. By using the disjunctive "or" the Supreme Court clearly meant that "severe" and "pervasive" are alternative possibilities. In other words, some conduct, although isolated and sporadic, may be severe enough to contaminate the workplace; whereas, other, less objectionable, conduct must be pervasive in order to contaminate the workplace such that it meets the threshold under the second prong of a hostile work environment claim.

contention that he suffered a racially hostile environment. Griffin testified, and Kimble admitted, that Kimble sent a racially offensive text message to Plaintiff. (*See* Doc. 19-2, Kimble Dep., 20:18-22:1; Doc. 19-5, Griffin Dep., 65:25-66:2.) Furthermore, Griffin testified that on at least two other occasions Kimble made racially offensive comments to Plaintiff. (Doc. 27-1, Griffin Answers to Interogs., at 5 of 10.) Finally, there is evidence in the record that Anne Simmons—HPS' vice president of human relations—received corroboration of a racially hostile environment from other employees whom she interviewed. *See supra*, n. 2.

Viewing this evidence in the light most favorable to Griffin, as the court must do as he is the party opposing summary judgment, the court concludes that Griffin produced sufficient evidence from which reasonable jurors could infer that Kimble's conduct toward Griffin was based on race. The two comments made in June of 2007 were explicitly racial, and the text message included a racial epithet. These comments and text message were all directed at Griffin, and because they were overtly racial, it would not be difficult for a jury to infer that they were intended by Kimble to be racially hostile. Accordingly, the court finds that Griffin has met the first prong of his *prima facie* burden.

### B. Severe or Pervasive

HPS next argues that the alleged activity was not sufficiently severe or pervasive to establish a hostile work environment. The court disagrees. A hostile work environment cannot be analyzed on an incident-by-incident basis, but rather the court must examine the totality of the circumstances. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 715 (3d Cir. 1997). While simple teasing, off-hand comments, and isolated incidents usually do not amount to discriminatory changes

in the terms and conditions of employment, the use of racial epithets—especially the word "nigger," which has a long and sordid history in this country—can quickly change the atmosphere, environment, and culture of a workplace from positive to poisonous. *See Rodgers v. W. S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993) (finding that the use of the word "nigger" on just two occasions contributed to a hostile work environment); *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D.Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se*.")

The court recognizes that the text message at issue in this case used the term "nigga" instead of "nigger," but the court fails to appreciate a difference between these two in the context of this case. The text message came only a few months after Kimble allegedly told two derogatory jokes to Griffin. Given the temporal proximity of these events, along with the severity of the derogatory language, a reasonable jury could conclude that Kimble's actions were sufficiently severe to turn the HPS security office into a hostile work environment.

### C. Detrimental Effect on Griffin

To establish a *prima facie* case, Griffin must also demonstrate that the racially hostile work environment detrimentally affected him and that it would have detrimentally affected a reasonable employee under like circumstances. The parties' briefs pay scant attention to these prongs of the *prima facie* case. HPS argues that Griffin produced no evidence that he was subjectively affected by Kimble's conduct because he was not distracted from his job performance, nor was he prevented from advancing his career, and, moreover, his psychological well-being was unaffected. (Doc. 21 at 10-11.) The court agrees that there is little evidence of the effect that

Kimble's text message and comments had on Griffin, but believes that there is sufficient evidence to meet this prong of the test. Griffin testified at his deposition that the text message offended him and that he was upset by it. (Doc. 19-5, Griffin Dep., 80.) For the purposes of meeting the subjective element of the test, this is sufficient.

> In *Harris v. Forklift Sys. Inc.,* the Supreme Court put it this way:
>
> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. *Moreover, even without regard to these tangible effects*, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.
>
> . . .
>
> So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive there is no need for it also to be psychologically injurious.

510 U.S. 17, 22 (1993)(emphasis added). Although marginal, the court believes that a reasonable jury could conclude that the environment in HPS' security office was objectively hostile, and that it was perceived to be hostile by Griffin.

### D. **Liability by HPS for the actions of Kimble**

Thus, it all comes down to the fifth and final prong. The court has already determined that Plaintiff has adduced sufficient evidence from which a reasonable jury could conclude that he suffered harassment that was severe or pervasive, that Griffin was subjectively affected by this environment, and that a

reasonable person under like circumstances would be affected by the racial hostility evident in HPS' security department. However, the liability of HPS for this racially hostile work environment caused by Kimble is not automatic despite the fact that Kimble was a supervisory employee.[7] This notion was rejected by the Supreme Court in *Meritor*, and instead, the Court directed that agency principles be used as guidance in determining employer liability for hostile work environments created by employees. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72 (1986).

In elaborating on the Supreme Court's deference to principles of agency law, the Third Circuit has recognized three potential bases in the *Restatement (Second) of Agency* for holding employers liable for harassment committed by their employees. First, "employers are liable for the torts committed by employees within the scope of their employment." *Knabe v. Boury*, 114 F.3d 407, 411 (3d Cir. 1997). This is not a factor in the case at bar. There is no indication from the parties or the record that any torts were committed by Kimble, and much less that anything that he did was done within the scope of his employment. Moreover, the Third Circuit has recognized that this theory of liability is inapposite in hostile work environment cases where "the harasser is not explicitly raising the mantle of authority to cloak the plaintiff in an unwelcome atmosphere." *Bouton v. BMW of N.A. Inc.,* 29 F.3d 103, 107 (3d Cir. 1994.)

The other two agency theories through which a plaintiff can hold an employer liable for a racially hostile work environment are: (1) where an employer

---

[7]The parties do not address the nature of Kimble's supervisory functions, but neither party appears to contest the assertion that Kimble was a supervisor. Accordingly, the court will address HPS's liability for Kimble's conduct based on the assumption that Kimble was a supervisor rather than a co-worker.

was negligent in its failure to discipline or fire, or failure to take remedial action upon notice of harassment; and, (2) where the harassing employee relied upon apparent authority or was aided by the agency relationship. *Knabe*, 114 F.3d at 411 (citing *Bouton,* 29 F.3d at 106). Although not explicit, it appears from the briefing that Griffin relies on the former principle in contending that HPS is liable for the hostile work environment created by Kimble. In any event, there is simply no evidence that Kimble relied upon any apparent authority that he had as a supervisor or that HPS in any way aided him in making the racially derogatory comments or in sending the text message. Thus, any liability of HPS for the conduct of Kimble hinges upon whether it was negligent in failing to take the appropriate remedial action upon notice of the harassment. Based upon the record before it, even viewing the evidence in the light most favorable to Griffin, the court concludes that the actions taken by HPS, once it became aware of the racially hostile environment, were reasonably calculated to stop Kimble's harassment.

The first incidents of racial harassment occurred in June of 2007, but there is no evidence that HPS was aware of Kimble's actions until October 19, 2007, when Griffin reported receipt of the text message to Carol Rossi, HPS' vice president for human resources. On Monday, October 22, 2007—six days after the text message, and three days after she became aware of the problem—Rossi directed Anne Simmons, the human resources manager, to conduct an investigation into the complaint by Griffin. (Doc. 19-4, Anne Simmons Dep., 11-12.) Griffin had a meeting with Simmons where he requested a transfer to a position at another of HPS' properties so that he would be supervised by someone other than Kimble. That request was granted. Furthermore, HPS undertook an investigation of all of the

complaints lodged by Griffin, and in addition to interviewing Griffin, HPS interviewed Kimble and at least six other employees identified by Griffin as having knowledge of the substance of his complaints. Ultimately, HPS determined that Kimble sent an inappropriate joke to Griffin and issued Griffin a final warning in his personnel file. Additionally, HPS conducted a in-house diversity training to educate its staff.

The court concludes that these actions were reasonably calculated to prevent future instances of racial harassment by Kimble and others. HPS interviewed all of the individuals identified by Griffin and others, reprimanded and disciplined Kimble for the specific instances of racial harassment, and provided in-house diversity training designed to educate its staff about racial harassment and workplace diversity. Furthermore, HPS granted Griffin's request to be transferred to another position where he would no longer be supervised by Kimble. All of these measures were logically and reasonably designed to prevent further instances of harassment by Kimble and others within HPS, and as such, HPS cannot be held liable for the actions of Kimble. *Huston v. P&G Paper Prods. Co.,* 568 F.3d 100, 110 (3d Cir. 2009) ("An employer's remedial action is adequate if it si reasonably calculated to prevent further harassment." (citations omitted)); *Knabe*, 114 F.3d at 414 ("So long as the remedy is reasonably calculated to prevent future instances of harassment, the company cannot be held liable under a negligence theory of agency.")

For his part, Griffin does not disagree that HPS undertook an investigation or that it took the steps outlined above; he simply contends that HPS did not do enough and that it did not fully investigate all of his claims. This is

immaterial. "[I]f the remedy chosen by the employer is adequate, an aggrieved employee cannot object to that selected action. . . . [and] and employee cannot dictate that the employer select a certain remedial action." *Knabe,* 114 F.3d at 414. Moreover, even if HPS's investigation was lacking—although this court concludes that it was not—an employer cannot be held liable if the remedial action was adequate, an assessment that "can be answered at the time the remedy is put into place." *Id.* at 415.

        Griffin argues that there is evidence that the racial discrimination continued after the remedial measures taken by Defendant, and that this demonstrates that those measures were insufficient.[8] As described above,

---

[8] Plaintiff's claim that the harassment continued is based on his assertion that he was singled out and targeted by Pat Shull. Griffin offers no explanation as to the nature of this alleged harassment by Pat Shull, and, in fact, he testified in his deposition that Pat Shull never did anything to harass him. (*See* Doc. 19-5, Griffin Dep., 69:23-25 (Q: "Did Pat Shull do anything ever to harass you under your definition of harassment?" A: "No").) Without supporting evidence, the court cannot give credence to Griffin's bald assertion that he was harassed by Pat Shull. Assuming that Griffin is referring to the alleged retaliation by his new supervisor, Ralph Shaw, the court has already determined that this claim is not properly before the court, and that the court will not permit Griffin leave to amend his complaint at this late stage of the proceedings. *See supra* n. 4.

        Griffin also argues in his brief that he was treated less favorably than Caucasian employees with regard to the assessment of points in his personnel file. (Doc. 26 at 9.) While this is Griffin's contention in his brief, his deposition reflects that the point system at HPS, while perhaps problematic, does not appear to be racially motived. Griffin testified as follows during this deposition:

    Q:    And you believe that only African-Americans are the ones who are being discriminated against and no other person [sic]?
    A:    I wouldn't say like – if you're African-American and you're part of the culture, they'll look out for you as far as the point system.
    Q:    Part of the employment culture, not part of the African-American culture, you're talking about part of the culture that exists in the working environment?

    A:    Yes, as far as – it's basically more – it's racism but its more of a click [sic].

(Doc. 19-5, Griffin Dep., 38:20-39:5.) Later, Griffin responded similarly to a question from opposing
(continued...)

the remedial measures taken by an employer only have to be *reasonably calculated* to remedy the harassment. The fact that they do not do so may be evidence that is helpful to a plaintiff's case, "but it is not necessary for resolving whether, at the time it was carried out, the employer's response was reasonably calculated to end the harassment." *Id.* Here, the steps taken by HPS—given the conduct complained of—were targeted towards addressing the offending behavior. A reprimand, formal discipline, company-wide diversity training, as well as granting Griffin's request to be transferred to a different building away from the supervision of Kimble, are all reasonable, calculated steps designed to end the harassment. This is all that is required of an employer to defeat liability under Title VII. Consequently, HPS is entitled to summary judgment.

---

⁸(...continued)
counsel:
    Q:    Doesn't really matter if you're a woman or a man or African-American or Caucasian, if you're not in the click [sic] you don't get the benefits, is that right?
    A:    Yes.

(*Id.* at 43:14-17.)
    In light of the foregoing, it begs the question whether there actually is evidence of racial tension and harassment at HPS after HPS took remedial steps. This is particularly true in light of the fact that after February 2008, Griffin made no specific complaints to HPS' human resources department. (Doc. 19-5, Griffin Dep., 24-25). Although Griffin testified that he did not bring anything to HPS' attention because "the environment wasn't getting better" he has pointed to no specifics that would permit a finder of fact to infer that the remedial measures taken by HPS were not reasonably calculated to end the harassment.

**IV.	Conclusion**

Although the court finds that Griffin has produced sufficient evidence demonstrating that he suffered from a hostile work environment because of the actions of Kimble, the court will grant HPS' motion for summary judgment because the court finds that there is no genuine issue of material fact that, once it became aware of the problem, HPS took remedial measures that were reasonably designed to remedy the harassment. This is all that the law requires, and as such HPS is entitled to the benefit of summary judgment. An appropriate order will be issued.

s/Sylvia H. Rambo<br>United States District Judge

Dated: November 23, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**RASHEEN GRIFFIN,**

       **Plaintiff**

   v.

**HARRISBURG PROPERTY SERVICES, INC.,**

       **Defendant**

Civil No. 1:CV-08-1655

(Judge Sylvia H. Rambo)

# **O R D E R**

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant Harrisburg Property Services, Inc.'s motion for summary judgment, (Doc. 19), is **GRANTED**. The clerk of court shall enter judgment for Defendant against Plaintiff and close the case.

                                                s/Sylvia H. Rambo
                                                United States District Judge

Dated: November 23, 2009.